# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 15, 2013

## STATE OF TENNESSEE v. DENNIS MURPHY

**Appeal from the Circuit Court for Monroe County**
**No. 09-318     Carroll L. Ross, Judge**

---

**No. E2013-00632-CCA-R3-CD - Filed January 14, 2014**

---

Dennis Murphy ("the Defendant") was convicted by a jury of attempted rape. Following a sentencing hearing, the trial court sentenced the Defendant to five years' incarceration. On appeal, the Defendant asserts that the trial court erred in admitting testimony regarding pictures not provided in discovery. He also challenges the sufficiency of the evidence supporting his conviction. Finally, the Defendant contends that cumulative errors denied him a fair trial. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Brian E. Nichols, Loudon, Tennessee, for the appellant, Dennis Murphy.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Steven Bebb, District Attorney General; and Krista Oswalt, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Monroe County Grand Jury indicted the Defendant on one count of rape. The Defendant proceeded to a jury trial on June 28, 2011, but the trial court granted the Defendant's motion for mistrial and allowed the Defendant a new trial. The Defendant then proceeded to a jury trial on February 23, 2012.

KM[1] was sixteen years old at the time of trial. She testified that she currently lived in Sweetwater with her aunt. From the time she was six years old until she was fourteen years old, however, she lived with her father, the Defendant, and his girlfriend in Tellico. She stated that, during the entire span of time in which she lived with the Defendant, he regularly raped her. KM denied having sexual intercourse with anyone other than the Defendant during this period of time.

KM recalled specifically that, on August 18, 2009, she had returned from school to the Defendant's residence at approximately 4:00 p.m. She "fed and watered [the] dogs," then the Defendant "hollered for [her] to get him something to drink in his big jug." She explained that the Defendant's girlfriend's room was on the opposite end of the house from her room and the Defendant's room. On this day, the Defendant's girlfriend was asleep in her bedroom, and the door to the bedroom was open. KM did not think that the television was on in the living room.

KM testified that she entered the Defendant's bedroom and placed the Defendant's drink on his night stand next to where he was lying on the bed. When she began to walk out of the room, however, he grabbed her arm. According to KM, "He grabbed my arm and pulled me onto his bed and was touching my breasts and vagina." KM clarified that the Defendant was touching her underneath her clothes. She continued,

> I was crying, asking him to stop, and just hoping he would, but he didn't.
>
> . . . .
>
> He – since I wouldn't be quiet, he told me to get out, and I had to climb over top of him to do that, and whenever I got onto the floor to leave his room, he grabbed my arm again and pulled my clothes off of me, and raped me.

KM clarified that by "raped" she meant that the Defendant "stuck his penis into [her] vagina."

When asked whether the Defendant ever was physically abusive during this incident, KM responded, "[S]ince I wouldn't be quiet, he hit me on the side of my head." She confirmed that she was scared of the Defendant. KM stated, "He finished and told me to get out of his room. I was still crying, and he grabbed my jaw. It felt like he almost broke it.

---

[1] It is the policy of this Court not to use the names of victims of sexual crimes.

And then I went back to my room." By "finished," KM meant that the Defendant "ejaculated."

A couple of days after the incident, KM told some of her friends what had happened. One of her friends had undergone a similar experience and encouraged KM to report the incident to the guidance office. She eventually had a medical examination, in which "[t]he nurse took pictures of the inside of my vagina, of scar tissue and stuff from previous trauma."

KM stated that she loved the Defendant as her father but not for what he did to her. She denied accusing the Defendant of this crime in order to get away from him but rather stated, "I'm doing it because I was tired of the abuse, and for my own safety." She confirmed that, since living with her aunt, her grades in school had improved and she had not gotten into trouble at school.

On cross-examination, KM did not recall telling a medical professional, Sally Moss, that the incident with the Defendant took place between approximately 7:00 p.m. and 10:00 p.m. Rather, she insisted that this incident occurred right after she finished feeding the dogs, which was approximately between 4:00 p.m. and 5:00 p.m.

KM stated that her scream was not loud when the Defendant raped her. She confirmed that she had bruising from the Defendant's hitting her. However, when asked if Moss would be lying if she testified that, three days after the incident, she did not witness any bruising on KM, KM replied, "No." She acknowledged that one could see from the Defendant's bedroom into his girlfriend's bedroom, but she was not aware that the entire length of the trailer was eighty feet. KM did not know if the Defendant's girlfriend overheard any of the incident.

KM acknowledged that the Defendant was a truck driver and had been in a serious accident prior to this incident. As a result of this accident, he had to have knee replacements and walked with a walker "in public." KM insisted, however, that it was not difficult for the Defendant to walk at the time of the alleged incident. The Defendant also was diabetic. Although the Defendant received worker's compensation, KM did not believe that the Defendant was injured to the point that he no longer could drive a truck.

KM stated that she did not struggle with the Defendant "because [she] was terrified of him. There was no point in struggling. It would have just made it worse." According to KM, this sexual abuse occurred "[e]very week, whenever he could get a chance." During the summertime, KM would travel with the Defendant on his trips as a truck driver, and he would sexually abuse her every time they stopped. She acknowledged that, although he only used protection on a couple of occasions, she never became pregnant from this abuse.

-3-

KM did not recall that the Defendant acquired custody of her when she was six years old because of alleged sexual abuse by a stepparent. She acknowledged, however, that such sexual abuse occurred.

KM confirmed that she did not want to live with the Defendant at that time for several reasons, including all of the chores she had to do and the fact that he did not let her go out with her friends. She acknowledged that she had forged the Defendant's name on school documents and that she had stolen his prescription medication. KM was not honest with the police regarding either of those instances. She also stole some playing cards displaying sexual images from the Defendant and gave them to a boy at school.

According to KM, the Defendant's girlfriend would not allow KM to wear makeup. She acknowledged that, when Moss performed a rape kit on her, Moss did not find the presence of semen. KM recalled writing letters to friends at school and identified a letter to a classmate in which she stated, "I'm really going to miss everyone this year. I can't wait till next year so I can see them." She denied, however, writing this note because she was aware of the allegations she was planning to bring against the Defendant. On re-direct examination, she explained, "I was going into high school, and [the recipient of the letter] was a grade younger than me, so he'd still be in the junior high and I wouldn't get to see him, or any of my friends that were a grade younger than me."

KM believed that approximately five dogs were inside the house and more than ten dogs were outside the house at the time of the incident but did not recall any of them barking while the incident occurred. KM stated that the reason that she no longer wanted to live with the Defendant was because of "the abuse. I was tired of it . . . the abuse." She explained that she waited so long to tell anyone about this abuse "[b]ecause [the Defendant] threatened to kill [her] if [she] ever told anybody."

Sally Moss, a registered nurse at the Judicial Children's Advocacy Center, testified as an expert in sexual assault examination. She stated that on August 21, 2009, she conducted a sexual assault examination of KM. Moss recalled that KM was so nervous at the beginning of her interview that she was shaking. From her interview with KM, Moss stated, "[KM] had had a history of some head injury, and she said that [the Defendant] had hit her. She also has some issues with migraine headaches." According to Moss, KM showed Moss a pink area on her cheek and indicated that the Defendant had hit her there.

Moss tried to explain to KM that she would be examining KM's genitalia, including her hymen. KM replied, "I'm sure that was popped a long time ago," and then clarified, "[The Defendant]'s been doing this to me since I was six." Moss testified,

-4-

[KM] told me that [the Defendant] would pull her hair, and she said, "What's left of it." Well, I thought she was talking about the hair on her head, and I made note because I was doing my head to toe assessment. And I made note, I said, "Well, I don't see any hair missing here." And she said, "No, I'm not talking about that hair," and she pointed down to her pubic hair and said he would pull that hair.

When Moss asked KM whether she had been sexually active with anyone other than the Defendant, KM replied, "I'd probably still be a virgin if it wasn't for my dad."

Moss then testified regarding her findings from KM's physical examination as follows:

Whenever I did the genitalia assessment, there were three significant findings that . . . are indicative of – which show actually what she had told me. . . . But the external genitalia, you have your labia majora, which are your fatter, outside lips, we would say, of this genitalia. And at the base of that where these areas come together is your posterior forchette, and then below this is your perineum. And on this area, right above this area, there is a fossa. It is actually not a structure; it is a space, and it is that space that is formed where these labia come together. Then inside of these labia majora which are on the outside, you have labia minora on the inside. Then in the middle of this is your hymen, which is a collar type around your opening into your vaginal orifice. The fossa is this little space right here at the base where these majora come together. What I found with [KM] is she had a jagged scar that went kind of like a "Z" down from this fossa, and then at the bottom part, not only was it a zagged "Z" shaped scar, but there was [sic] bands of tissue, two different areas where there was a band of tissue going across this a way. And then up further, which is also deeper into the genitalia, on her hymen, there was a purple discoloration right – like whenever I document my assessment, I super-impose in my mind the face of a clock so that I can say where these different structures are, so that would have been at six o'clock on this hymenal collar, this tissue, that there was a purplish discoloration at that area.

Pertaining to the scarring, Moss explained, "This particular type of injury could be from being spread apart forcibly, and also, it could be from pressure being applied right here at this point. This would be similar to where a lady would have an episiotomy as she had a baby." She continued, "I would not expect to see anything like that with consensual sexual intercourse."

Moss further testified:

[KM] told me, "He put his penis in my thing," but then she also added, "I don't think it went all the way in this time." And she told me that he usually saw that it did, but this time that she didn't think it went in all the way, which would make perfect sense for why we have a purplish discoloration here on the hymen and not a tear in that particular hymen. If it didn't go in all the way, the pressure, this purple spot, I can see that that would be the pressure point where it didn't go in all the way.

Moss testified that the purple discoloration she observed either could indicate a bruise or other trauma to that area. In her opinion, injury to this tissue would heal within a few days, so the discoloration indicated a fairly recent trauma. When asked whether the location of the injury being at the "six o'clock" position was significant, Moss replied,

Yes, that's very significant, because you have to always consider what the mechanism would be for injury. . . . Any injury above the 9:00 and three o'clock area could be caused from a fall, so above this area, if you, if you fall, like a monkey bar fall – and I have examined children that have had these injuries in the upper area from falls, and anything above that could be from a fall. Anything below that would be from penetrating type injury or an attempted penetrating type injury, something poking in that direction.

Moss confirmed that she performed a rape kit on KM because she examined KM within seventy-two hours of alleged sexual contact.

From her assessment of KM, she determined that KM had recent blunt force trauma as well as scarring from past trauma.

On cross-examination, Moss acknowledged that, at the time she performed this examination, it "was very, very early on in [her] career in this field." At the time of trial, she had three years of experience within this particular field. She also acknowledged that none of her documents pertaining to KM's exam mentioned the "'Z' shaped" scarring to which she had testified.

Moss denied that consensual sexual intercourse could cause the amount of scarring that she found on KM but acknowledged that scarring would not be the result of alleged sexual conduct occurring within close proximity to her examination in August 2009. She confirmed that KM had admitted to doing things to herself such as "self-piercings." She also

acknowledged learning after the examination that the rape kit came back negative for the presence of semen.

Moss confirmed that KM had told her that KM used a washrag after these alleged incidents with the Defendant, but Moss believed that KM also had relayed this information to those involved in the investigation. She also confirmed that KM had told her that the most recent event occurred "between 7:00 and 10:00 p.m." but that KM could not recall the specific day.

Officer Tommy Jones with the Sweetwater Police Department testified that on September 3, 2009, he worked as a deputy for the Monroe County Sheriff's Department. On that day, he and Captain Travis Jones arrested the Defendant at his residence. The Defendant did not resist arrest. According to Officer Jones, the Defendant was not using the assistance of a walker or cane and did not seem to walk with a limp. Officer Jones testified,

> As we was [sic] going to the jail, he asked what he was being arrested for. I told him I didn't know . . . . So we continued on a little further. He said it was probably something to do with his daughter. Then he goes into telling me this dream that he had, that he's laying in bed, and he's having a dream that he's on a beach and two beautiful women are making love to him. And as he starts to ejaculate, he wakes up and notices that his daughter's on top of him.

Officer Jones said nothing more to the Defendant until handing the Defendant over to the jail staff. The Defendant seemed "calm and relaxed all the way to the jail."

At the conclusion of the State's proof, the defense moved for a judgment of acquittal, which the trial court denied. The defense then proceeded with its proof. Captain Travis Jones testified that he was aware of the conversation the Defendant had with Officer Jones regarding the Defendant's dream. He agreed that the Defendant had been interrogated on August 21, 2009, during which the Defendant was informed that DNA was present on KM's vaginal area and that KM "had reported to police that at times when [the Defendant] would be passed out from sleeping medication, that she would climb on top of him and initiate sex herself."

Captain Jones recalled that he observed the Defendant using a cane on the day of his interrogation. He agreed that the Defendant submitted swabs for DNA analysis and offered to take a polygraph test. On cross-examination, Captain Jones stated that the interrogation lasted approximately two hours and that the Defendant never complained of having pain. Captain Jones confirmed that he was the person who retrieved the rape kit and submitted it

to the Tennessee Bureau of Investigation for analysis. He also confirmed that the rape kit tested negative for the presence of semen or DNA.

The Defendant testified that he had lived in Monroe County for approximately twelve to fourteen years. He had been a truck driver but was in an accident in 2005 and had not worked since April 2007. From this wreck, he sustained several injuries and received a worker's compensation settlement. The Defendant had knee replacement surgery in 2008 and used the assistance of a walker and then a cane in 2009.

The Defendant gained custody of KM in 2001. At this time, the Defendant learned that KM potentially had some prior sexual abuse. He stated that his residence is a sixteen-foot wide by eighty-foot long trailer. Someone in the Defendant's bedroom would have a "straight shot" visually into his girlfriend's room. He estimated that the two rooms are approximately fifty to sixty feet apart.

When the Defendant was informed of these allegations on August 21, 2009, he told Captain Jones that "[t]here ain't no way" he committed this crime. The Defendant further testified, "That's disgusting. There's no way I'd do anything like that. That's incest." During the Defendant's interrogation, the officers told the Defendant "at least [fifty] times that [KM] had slept on, had climbed on top of [him] and had sex with [him]." The Defendant responded that the only way such a thing could have occurred was if he were "passed out drunk or doped up on [his] sleeping pills." Eventually, the officers informed the Defendant that semen had been retrieved from inside KM.

The Defendant testified that KM "was very untrustworthy because she lied so much." Specifically, KM lied about doing her chores and getting kicked off the school bus. In fact, KM had forged a document requiring parental acknowledgment that she had been kicked off the school bus. On different occasions, KM had stolen ibuprofen, syringes, and playing cards depicting sexual positions from the Defendant.

The Defendant stated that, because of KM's lies, KM did not have a good relationship with the Defendant's girlfriend. The Defendant would not allow KM to spend time outside of school with friends because he did not trust her friends. When asked why KM might make these allegations against the Defendant, the Defendant responded, "Because she hated me because I wouldn't let her have her way, like her so-called friends could go out and do what they wanted."

The Defendant did not recall having the conversation with Officer Jones regarding the dream about sex. According to the Defendant, Officer Jones was talking to someone on his

cell phone and allowed the Defendant to use his own cell phone, so they both talked on their respective cell phones throughout the drive.

On cross-examination, the Defendant acknowledged that, not only did he not allow KM to go out with friends, but he also kept her away from her family. The Defendant had stated on direct examination that, if he had hit KM, he would have "caved her face in." He explained that he was left-handed and that his left arm still had "pretty good strength." However, when the State asked on cross-examination whether the Defendant could grab KM with his left arm, the Defendant stated, "I probably couldn't hold onto her, no." He explained that he no longer could grip like he could prior to his accident.

The Defendant identified his statement to police and read the following from the statement: "On Tuesday night, I woke up and [KM] was on top of me having sex with me. I pushed her off the top of me and asked her why, and she said, 'I don't know why.'" He agreed that he previously had testified that the only way such a scenario could have occurred was if he were passed out from alcohol or sleeping pills, even though he used the phrase "woke up" in his statement. The Defendant maintained, however, that he did not recall this scenario ever occurring.

On redirect examination, the Defendant recalled being asked about having wet dreams when he was questioned about KM having sex with him while he was passed out. The Defendant stated that he had approximately nineteen dogs at his residence and that three or four of those dogs were allowed inside his residence. Regarding the inside dogs, the Defendant testified, "I couldn't do nothing in that house without them [sic] dogs raising Cain. I couldn't walk, I couldn't get out of my bed and walk through the house without them raising Cain."

At the conclusion of the defense's proof, the jury deliberated and found the Defendant guilty of attempted rape. Following a sentencing hearing, the trial court sentenced the Defendant to five years' incarceration. The Defendant filed a motion for new trial, which the trial court subsequently denied. He timely appealed, arguing that: the trial court erred in allowing Sally Moss to allude in her testimony to pictures taken that had not been provided to the defense in discovery; the evidence is insufficient to support his attempted rape conviction; and the combination of errors require a new trial.

## Analysis

### *Expert Testimony*

The Defendant first argues that the trial court erred in allowing Sally Moss to testify about pictures taken during her examination of KM that had not been provided to the Defendant in discovery.

At trial, Moss testified that, during her examination of KM, she used a tool called a coloposcope to take magnified pictures of KM's injuries. Moss testified to the photographs' existence, stating,

> I do have pictures of her exam. They're not my favorite pictures, because she was having a hard time holding still, and anytime you have that much magnification and a little bit of movement, it makes them a little bit blurry, but I do have pictures and it does show injury.

At this point in the testimony, defense counsel objected to the introduction of these photographs of KM's injuries, asserting that he had not been provided these photographs in discovery. The State replied that it did not intend to introduce the photographs into evidence. Defense counsel stated,

> I interpose this objection, that the, asking about pictures and saying that they are pictures that would show injury, without providing these pictures, I would suggest has, has an effect on the jury which is unfair and unjust to the defendant. Obviously, it would go without saying that if I had such pictures, we would have certainly hired an expert to observe those pictures.

The State countered that the pictures "were copied to a disk and left at . . . the D.A.'s office." Defense counsel moved for a mistrial based on the discussion of the photographs in front of the jury. The trial court denied the motion for mistrial but asked defense counsel if he wanted the court to provide a jury instruction, noting that sometimes curative instructions draw more attention to improper comment. Following a brief recess, defense counsel notified the trial court that the defense did not want a curative instruction.

We first note that the trial court did not allow Moss to allude to these pictures, as the Defendant contends. Moreover, the trial court asked the defense if it wanted the trial court to provide a curative instruction to the jury. Thus, although not explicitly stated in his appellate brief, we glean from the Defendant's argument that he believes the trial court should have declared a mistrial.

The determination of whether to grant a mistrial is a decision left to the trial court's sound discretion, and this Court will not disturb the trial court's determination "absent a clear abuse of discretion on the record." State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). Essentially, "[t]he purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A court should grant a mistrial only when a "manifest necessity for such action" exists. State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003) (citing State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). The party seeking the mistrial bears the burden of establishing its necessity. Williams, 929 S.W.2d at 388.

In deciding whether to grant a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting Jones v. State, 403 S.W.2d 750, 754 (Tenn. 1966)). This Court has considered the following three factors in assessing whether the trial court abused its discretion in its decision not to grant a mistrial: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

Turning to the first factor, we find that it was in fact the State eliciting the testimony of Sally Moss regarding the photographs she produced using her coloposcope. Therefore, the first factor weighs in favor of the grant of a mistrial.

We next turn to the second factor, which is whether the trial court provided the jury with a curative instruction. Following lengthy discussion among the trial court, the defense, and the State, the trial court denied the defense's motion for mistrial. The trial court offered to provide a curative instruction but asked the defense to consider whether giving such an instruction would only further draw attention to the discussion of the photographs. Following a brief recess, the defense announced that it would not seek a curative instruction. Our supreme court has stated that "the trial court's offering of a curative jury instruction, and [the Defendant's] refusal of the curative instruction for tactical reasons, is significant to the analysis." State v. Nash, 294 S.W.3d 541, 547-48 (Tenn. 2009) (citations omitted); see also State v. William Lavern Davis, No. 01C01–9803–CC–00138, 1999 WL 5436, at *2 (Tenn. Crim. App. Jan.7, 1999) (holding that the trial court did not err in denying a motion for mistrial when the defendant refused the trial court's offer of a curative instruction and the error was "harmless in light of the overwhelming evidence"). Therefore, this factor weighs significantly against the grant of a mistrial.

-11-

Finally, we look to the third factor, which is "the relative strength or weakness of the State's proof." Welcome, 280 S.W.3d at 222. Even without Moss' reference to photographs of KM's injuries, the jury had more than ample proof to convict the Defendant of attempted rape. Moss testified extensively to her written findings from her physical examination of KM and regarding the injuries she found evidencing trauma. KM testified to the specific details of the incident involving the Defendant. Therefore, this final factor clearly weighs against the grant of a mistrial.

Based upon our consideration of all three of these factors, we conclude that the trial court did not err in failing to declare a mistrial. Accordingly, the Defendant is entitled to no relief on this issue.

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or

substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

As charged in this case, rape is defined as "unlawful sexual penetration of a victim by the defendant or a defendant by a victim" when "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (2006). To obtain a conviction for attempted rape, as applicable here, the State must prove that the Defendant acted with the intent to commit rape and:

> (1) Intentionally engage[d] in action or cause[d] a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believe[d] them to be;
>
> (2) Act[ed] with intent to cause a result that is an element of the offense, and believe[d] the conduct will cause the result without further conduct on the person's part; or
>
> (3) Act[ed] with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believe[d] them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a)(1)-(3) (2006).

Additionally, "[c]onduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. at § -101(b). Moreover, "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed." Id. at § -101(c).

At trial, KM testified that on August 18, 2009, the Defendant asked KM to bring his drink to him in his bedroom. After she placed the drink on his night stand, the Defendant "grabbed [her] arm and pulled [her] onto his bed and was touching [her] breasts and vagina" under her clothes. KM continued,

> He – since I wouldn't be quiet, he told me to get out, and I had to climb over top of him to do that, and whenever I got onto the floor to leave his room, he grabbed my arm again and pulled my clothes off of me, and raped me.

She clarified that by "raped" she meant that the Defendant "stuck his penis into [her] vagina."

-13-

Moreover, Sally Moss testified at trial that, as a result of her physical examination of KM on August 21, 2009, she found purple discoloration on KM's hymen which indicated fairly recent trauma.

The Defendant argues that the jury returned a compromised verdict by acquitting him of rape but convicting him of attempted rape. We disagree.

Tennessee statute requires that

the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. . . [and] whether the evidence . . . is legally sufficient to support a conviction for the lesser included offense.

Tenn. Code. Ann. 40-18-110(a) (2006).

Here, although KM testified at trial that penetration occurred, Moss testified,

[KM] told me, "He put his penis in my thing," but then she also added, "I don't think it went all the way in this time." And she told me that he usually saw that it did, but this time that she didn't think it went in all the way, which would make perfect sense for why we have a purplish discoloration here on the hymen and not a tear in that particular hymen. If it didn't go in all the way, the pressure, this purple spot, I can see that that would be the pressure point where it didn't go in all the way.

Therefore, the jury could have accepted Moss' testimony over that of KM's at trial that the Defendant actually may not have penetrated KM on this occasion. Therefore, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of attempted rape. Accordingly, the Defendant is entitled to no relief on this issue.

*Cumulative Error*

The Defendant, in his concluding paragraph, also argues that the combination of errors denied him a fair trial. However, in making this assertion, the Defendant cites to no authority and makes no further argument. Thus, the Defendant has waived this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities,

or appropriate references to the record will be treated as waived in this court.").  Moreover, we have found no errors in the judgment of the trial court.  Thus, there can be no cumulative error.  See State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the proceedings.").

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE